No. 21-30754

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

RICHARD HERSHEY,
*Plaintiff –Appellant*

v.

CITY OF BOSSIER CITY; BOBBY GILBERT, INDIVIDUALLY AND IN HIS
CAPACITY AS DEPUTY MARSHAL; DANIEL STOLL; DAVID SMITH;
TYSHON HARVEY; EUGENE TUCKER,
*Defendants – Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA,
HON. TERRY A. DOUGHTY, CIVIL ACTION NO. 5:21-CV-460

**DEFENDANT–APPELLEE CITY OF BOSSIER CITY'S
PETITION FOR REHEARING EN BANC**

Layne A. Clark, Jr. (La. Bar 23686)     Thomas M. Flanagan (La. Bar 19569)
Reid A. Jones (La. Bar 34611)            Anders F. Holmgren (La. Bar 34597)
WIENER WEISS & MADISON APC               Jordan B. Redmon (La. Bar 37272)
330 Marshall Street, Suite 1000          FLANAGAN PARTNERS LLP
Shreveport, Louisiana 71101              201 St. Charles Avenue, Suite 3300
Tel: (318) 226-9100                      New Orleans, Louisiana 70170
                                         Tel: (504) 569-0235

Counsel for Defendant–Appellee, City of Bossier City

No. 21-30754

RICHARD HERSHEY,

*Plaintiff–Appellant*

v.

CITY OF BOSSIER CITY; BOBBY GILBERT, INDIVIDUALLY AND IN HIS CAPACITY AS DEPUTY MARSHAL; DANIEL STOLL; DAVID SMITH; TYSHON HARVEY; EUGENE TUCKER,

*Defendants – Appellees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Richard Hershey

    Plaintiff–Appellant

2.  M. Keith Wren
    WREN LAW FIRM
    11300 Executive Center Drive
    Little Rock, Arkansas 72211

    Sarah R. Giglio
    GILMER & GIGLIO, LLC
    3541 Youree Drive
    Shreveport, Louisiana 71105

    Counsel for Plaintiff–Appellant Richard Hershey

3. City of Bossier City, Deputy Marshal Bobby Gilbert, Officer Daniel Stoll, David Smith, Tyshon Harvey, and Eugene Tucker

   Defendants–Appellees

4. Layne E. Clark
   Marjorie L. Frazier
   Reid A. Jones
   WIENER, WEISS & MADISON APC
   330 Marshall Street, Suite 1000
   Shreveport, Louisiana 71101

   Thomas M. Flanagan
   Anders F. Holmgren
   Jordan B. Redmon
   FLANAGAN PARTNERS LLP
   201 St. Charles Avenue, Suite 3300
   New Orleans, Louisiana 70170

   Counsel for Defendants–Appellees City of Bossier City, Deputy Marshal Bobby Gilbert, and Officer Daniel Stoll

5. Sidney W. Degan, III
   Mandy A. Simon
   DEGAN, BLANCHARD & NASH
   400 Poydras Street, Suite 2600
   New Orleans, Louisiana 70130

   Counsel for Defendants–Appellees David Smith, Tyshon Harvey, and Eugene Tucker

/s/ Thomas M. Flanagan
Counsel for Defendant-Appellee,
City of Bossier City

# INTRODUCTION AND RULE 40(b)(2) STATEMENT

This is a single-incident failure-to-train case. It arises from leafleteering by "serial plaintiff"[1] Richard Hershey on the sidewalk of the grounds of an arena owned by the City of Bossier City but managed by a private entity. Hershey was passing out leaflets during a ticketed concert overseen by the private entity when City police officers and private security guards told him to leave. He left and was not arrested.

Hershey sued anyway. Claiming viewpoint discrimination, he sought damages from the officers and private security guards under 42 U.S.C. § 1983. He also brought a § 1983 single-incident failure-to-train claim against the City under *Monell*.[2] His theory? The City failed to train the officers—and the private security guards—that this specific arena is public property where citizens may freely exercise First Amendment rights. The district court was not persuaded and dismissed Hershey's claims under Federal Rule of Civil Procedure 12(b)(6). Hershey appealed.

A splintered panel opinion followed. One majority (Richman and Ho, JJ.) affirmed qualified immunity to the officers on the clearly-established-law prong: Given forum complexities, no precedent put them on notice that their conduct amounted

---

[1]    Judge Priscilla Richman's opinion ("PR Op.") 27.

[2]    *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

to prohibited viewpoint discrimination. That same majority affirmed dismissal of the claims against the private security guards, diverging on the rationale.

A separate majority (Dennis and Ho, JJ.) revived the failure-to-train claim. This failure-to-train majority held that Hershey adequately alleged the City acted with deliberate indifference to Hershey's First Amendment rights under the "very narrow" and "rare" single-incident exception.[3] These were the same rights that a separate panel majority had held were not clearly established. This majority thought Hershey met that exception because the City allegedly "provided no training whatsoever" to its officers—and private security guards—on First Amendment duties. But members of this same majority could not even agree on those duties.

Besides, Hershey's complaint did not allege "no training whatsoever"; it alleged failure to train on the First Amendment's application *to one forum*. To support their contrary conclusion, the failure-to-train majority cited Hershey's counsel's agreement with a remark about "literally zero training" that one judge made at oral argument. But counsel's comment at argument cannot retroactively amend Hershey's complaint.

---

[3]     *Garza v. City of Donna*, 922 F.3d 626, 638 (5th Cir. 2019) (quotation omitted).

Nor did the failure-to-train majority identify any allegation allowing a reasonable inference that the City knew or should have known of any need for nuanced First Amendment forum training. There was no allegation, for example, that any City officer had ever engaged in viewpoint discrimination, at the Center or elsewhere.

The upshot of the majority's failure-to-train holding is this: A municipality can be liable under § 1983 for failing to train its officers—and even privately employed security guards—on nuanced, unsettled constitutional law without any notice of a need for that training. That holding is en banc-worthy for at least three reasons.

*First*, the majority broke with Circuit precedent by holding that a municipality can be deliberately indifferent to constitutional rights that were not clearly established. Drawing from Chief Judge Sutton of the Sixth Circuit, this Court recognized in *Bustillos v. El Paso County Hospital District* that a policymaker cannot be deliberately indifferent to a constitutional right that has not been clearly established.[4] Under the rule of orderliness, *Bustillos* bound the majority and required it to reject Hershey's *Monell* claim.

---

[4] 891 F.3d 214, 222 (5th Cir. 2018) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012) (Sutton, C.J.)).

***Second***, as Judge Richman pointed out, the majority essentially embraced "strict liability" for failure to train.[5] In so doing, the majority "radically expand[ed]"[6] municipal liability and "substantially erode[d] and trivialize[d]"[7] deliberate-indifference precedents of the Supreme Court and this one.[8] A similar dilution of deliberate indifference was corrected in *Connick*. That case and others teach that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[9] But the fault standard the majority applied was not stringent; it required no fault at all.

***Finally***, the questions raised are exceptionally important for both doctrinal and practical reasons. As for doctrine, this Court considers scores of failure-to-train cases every year, and even more cases involving the deliberate-indifference standard in one context or another. If left standing, the majority's erroneous deliberate-indifference analysis will infect all of them and "open the door to permit a broad swath" of otherwise-doomed § 1983 claims to proceed to discovery.[10]

---

[5]    PR Op. 23.

[6]    *Id.* 22.

[7]    *Id.* 39.

[8]    *E.g.*, *Connick v. Thompson*, 563 U.S. 51, 61–72 (2011); *Henderson v. Harris Cnty.*, 51 F.4th 125, 130–32 (5th Cir. 2022) (per curiam).

[9]    *Connick*, 563 U.S. at 61 (quotation omitted); *see also Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (quotation omitted).

[10]   PR Op. 22.

On the practical side, the majority's broadening of the "extremely narrow"[11] single-incident method risks entangling the Fifth Circuit's federal courts "in an endless exercise of second-guessing municipal employee-training programs"[12] from Port Arthur to Pascagoula. That "exercise" is not only one "federal courts are ill suited to undertake"—it also "implicate[s] serious questions of federalism."[13]

The Court should grant en banc rehearing limited to the majority's mistaken *Monell* holding. Otherwise, the failure-to-train theory will "completely engulf *Monell*, imposing liability without regard to fault" across the Fifth Circuit.[14]

---

[11]  *Hutcheson v. Dall. Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021) (quotation omitted).

[12]  *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

[13]  *Id.* (citation omitted).

[14]  *Id.* at 395 (O'Connor, J., concurring in part and dissenting in part).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .....................................................i

INTRODUCTION AND RULE 40(b)(2) STATEMENT.................................. iii

TABLE OF CONTENTS ..............................................................................viii

TABLE OF AUTHORITIES ...........................................................................x

I.      STATEMENT OF THE ISSUES MERITING REHEARING EN BANC .......................1

        1.      Deliberate indifference absent clearly established law .........................1

        2.      Strict liability for failure to train. ........................................1

II.     STATEMENT OF THE COURSE OF PROCEEDINGS
        AND DISPOSITION ...........................................................................2

        A.      The City owns the CenturyLink Center but hires a private entity to
                manage and lease it to other entities for events.. .................................. 2

        B.      Hershey is paid to pass out leaflets on the sidewalk
                of the Center during a ticketed concert. .............................................. 2

        C.      Hershey sues under § 1983......................................................3

        D.      All claims are dismissed under Rule 12(b)(6). ....................................... 4

        E.      A fractured panel affirms dismissal as to the officers and security
                guards but reverses as to the City.....................................................5

III.    ARGUMENT ...........................................................................8

        A.      The panel majority's failure-to-train holding conflicts
                with precedents of this Court and the Supreme Court. ....................... 8

1. A municipality cannot be deliberately indifferent to constitutional rights that were not clearly established; the majority contravened that rule............10

2. The majority substituted strict liability for deliberate indifference ...........................................................12

B. The majority's errors present questions of exceptional importance.......................................................................14

IV. CONCLUSION.................................................................................15

CERTIFICATE OF SERVICE ................................................................17

CERTIFICATE OF COMPLIANCE ........................................................18

APPENDIX: PANEL OPINION..............................................................19

# TABLE OF AUTHORITIES

**Cases**

*Arrington–Bey v. City of Bedford Heights*,
    858 F.3d 988 (6th Cir. 2017) (Sutton, C.J.) ....................................12

*Bd. of Cnty. Commr's of Bryan Cnty. v. Brown*,
    520 U.S. 397 (1997) ..................................................................... 1, 8–9

*Bustillos v. El Paso Cnty. Hosp. Dist.*,
    891 F.3d 214 (5th Cir. 2018) .................................................. *passim*

*City of Canton v. Harris*,
    489 U.S. 378 (1989) .......................................................... vii, 8–9, 12

*Connick v. Thompson*,
    563 U.S. 51 (2011) ............................................................ vi, 9, 12, 15

*Garza v. City of Donna*,
    922 F.3d 626 (5th Cir. 2019) .....................................................iv, 9

*Hagans v. Franklin Cnty. Sheriff's Off.*,
    695 F.3d 505 (6th Cir. 2012) (Sutton, C.J.)................................. v, 11

*Henderson v. Harris Cnty.*,
    51 F.4th 125 (5th Cir. 2022) (per curiam)....................vi, 9, 10, 13–14

*Hutcheson v. Dall. Cnty.*,
    994 F.3d 477 (5th Cir. 2021)..........................................................vii

*Littell v. Hous. Indep. Sch. Dist.*,
    894 F.3d 616 (5th Cir. 2018)......................................................... 11

*Monell v. New York City Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ................................................................ *passim*

*Peña v. City of Rio Grande City*,
    879 F.3d 613 (5th Cir. 2018) ..........................................................vi

*Peterson v. City of Fort Worth*,
    588 F.3d 838 (5th Cir. 2009) .......................................................... 13

*Porter v. Epps*,
    659 F.3d 440 (5th Cir. 2011) .......................................................... 14

*Valle v. City of Hous.*,
    613 F.3d 536 (5th Cir. 2010) ........................................................... 8

*Zarnow v. City of Wichita Falls*,
    614 F.3d 161 (5th Cir. 2010) ........................................................... 6

## Statutes

42 U.S.C. § 1983 ................................................................... *passim*

## Rules

Fed. R. App. P. 32(a)(5) ........................................................... 18

Fed. R. App. P. 32(a)(6) ........................................................... 18

Fed. R. App. P. 32(f) ............................................................... 18

Fed. R. App. P. 40(b)(2) ........................................................... iii

Fed. R. App. P. 40(d)(3)(A) ....................................................... 18

Fed. R. Civ. P. 12(b)(6) ...................................................... *passim*

Fifth Circuit Rule 28.2 .............................................................. i

# DEFENDANT–APPELLEE CITY OF BOSSIER CITY'S
# PETITION FOR REHEARING EN BANC

## I.    STATEMENT OF THE ISSUES MERITING REHEARING EN BANC

1.    **Deliberate indifference absent clearly established law**. This Court has said that a "policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established."[15] One panel majority held that Richard Hershey's First Amendment rights were not clearly established, but a separate majority held that the City of Bossier City's alleged failure to train amounted to deliberate indifference to those rights. Can the panel majority overrule precedent that compelled it to conclude that the City was not deliberately indifferent to constitutional rights that were not clearly established?

2.    **Strict liability for failure to train**. A municipality is not vicariously liable under § 1983 and is not liable for failure to train employees unless that failure amounts to "deliberate indifference" under "rigorous standards of culpability and causation."[16] The majority held that the City of Bossier City could be liable for failure to train on the First Amendment's application to a specific forum, despite having no notice of any need to provide that specialized training. Does § 1983 allow strict liability for a municipality's failure to train employees on nuanced constitutional law?

---

[15]    *Bustillos*, 891 F.3d at 222 (emphasis in original) (quotation omitted).

[16]    *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997).

## II.   STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION

### A.   The City owns the CenturyLink Center but hires a private entity to manage and lease it to other entities for events.

The City of Bossier City owned the CenturyLink Center, a multipurpose arena in a public park.[17] The Center was managed by ASM Global, a private management company, and could be leased by private parties for exclusive events.[18]

### B.   Hershey is paid to pass out leaflets on the sidewalk of the Center during a ticketed concert.

The Center hosted a Christian rock concert.[19] ASM Global managed that ticketed event and provided security.[20] During the concert, "vegetarian advocate" Richard Hershey passed out "literature" for the Christian Vegetarian Association while standing on the public sidewalk.[21] He was paid for his work.[22]

ASM Global employees David Smith, Tyshon Harvey, and Eugene Tucker were working as private security guards.[23] Two City police officers, Deputy Marshal Bobby Gilbert and Officer Daniel Stoll, also provided security.[24]

---

[17]   ROA.95 ¶ 5, ROA.98 ¶ 21.

[18]   ROA.158.

[19]   ROA.99 ¶ 24.

[20]   ROA.157–ROA.160, ROA.97 ¶ 13.

[21]   ROA.98 ¶¶ 15–16.

[22]   ROA.98 ¶ 17.

[23]   ROA.96 ¶¶ 8–10.

[24]   ROA.95–ROA.96 ¶¶ 6–7.

The officers and guards approached Hershey while he "distribut[ed] his literature[.]"[25] Deputy Marshal Gilbert told Hershey that he "was on private property," "had to leave," and would be arrested if he did not.[26] Hershey obliged.

## C.   Hershey sues under § 1983.

Hershey sued the City, the officers, and the private security guards under § 1983.[27] He is no stranger to litigation: A "serial plaintiff," Hershey's professional pamphleteering has spawned over a dozen other suits.[28]

Hershey sued for (1) declaratory and injunctive relief, (2) damages against the officers and private security guards for viewpoint discrimination, and (3) damages against the City for failing to train the officers and private security guards.[29]

Three allegations are relevant. First, Hershey alleged the sidewalk of the Center is a designated or traditional public forum.[30] Second, he alleged the private security guards were "willing participant[s] in joint action with" the officers.[31] And third, he alleged the City failed to train both its officers "and others allowed to serve as

---

[25]     ROA.100 ¶¶ 29–30.

[26]     ROA.101 ¶ 36.

[27]     ROA.94–111.

[28]     PR Op. 27; ROA.130 n.1.

[29]     ROA.103–ROA.110.

[30]     ROA.103  ¶¶ 52–54.

[31]     ROA.96 ¶¶ 8–10.

security personnel" (1) that the Center is public property and (2) "how to take into account the First Amendment rights of citizens on the [Center] property."[32]

### D. All claims are dismissed under Rule 12(b)(6).

A magistrate judge issued report and recommendations concluding all claims should be dismissed under Rule 12(b)(6).[33] As for the guards, the magistrate judge concluded Hershey did not allege conduct "fairly attributable" to the City.[34]

As for the officers, the magistrate judge concluded they were entitled to qualified immunity under the clearly-established-law prong.[35] The magistrate judge emphasized that "[v]ery little about this field of law is clearly established," [36] and that "there are many nuances to First Amendment claims of this nature . . . ."[37]

As for the City, the magistrate judge concluded that Hershey failed to state a failure-to-train claim.[38] Hershey inadequately alleged deliberate indifference under

---

[32] ROA.109 ¶¶ 67–69.

[33] ROA.231–ROA.254, ROA.279–ROA.290

[34] ROA.279–ROA.289.

[35] ROA.241–ROA.244.

[36] ROA.244.

[37] ROA.243.

[38] ROA.246–ROA.248.

the single-incident exception: He did not "allege that there was no training whatsoever with respect to persons passing out leaflets at the [Center] or similar public areas"; he instead "allege[d] that the City did not provide 'adequate' training."[39]

The district court adopted the report and recommendations over Hershey's objections and entered judgment against him.[40] Hershey appealed.[41]

### E. A fractured panel affirms the dismissal as to the officers and security guards but reverses as to the City.

After argument, a fractured panel (Dennis, Richman, and Ho, JJ.) affirmed in part and reversed in part. There were two majorities.

Forming the first majority, Judges Richman and Ho affirmed qualified immunity for the officers and affirmed dismissal of the guards. They agreed that this Court's precedent compelled qualified immunity for the officers under the clearly-established-law prong: Hershey cited no precedent that would have notified the officers that their alleged conduct violated his First Amendment rights.[42]

But this first majority parted ways on the rationale for affirming the dismissal of the guards. Judge Richman essentially agreed with the magistrate judge's conclu-

---

[39]     ROA.248.

[40]     ROA.277, ROA.296.

[41]     ROA.298.

[42]     Judge James C. Ho's opinion ("JCH Op.") 6–9; PR Op. 28–38.

sion that Hershey inadequately alleged the conduct of the guards was fairly attributable to the City.[43] Judge Ho concluded that the guards enjoyed qualified immunity for the same reasons the officers did—no clearly established First Amendment law.[44]

The second majority—Judges Dennis and Ho—reversed the dismissal of Hershey's failure-to-train claim against the City. This majority held that Hershey adequately alleged deliberate indifference through the single-incident exception. Hershey satisfied that exception, this majority found, by alleging that the City "provide[d] no training whatsoever with respect to the relevant constitutional duty."[45] In support of that conclusion, Judges Dennis and Ho cited Hershey's counsel's response to a question Judge Ho posed at oral argument.[46] But neither member of this majority cited a specific allegation in Hershey's operative complaint that allowed a reasonable inference that the City "provide[d] no training whatsoever."[47]

---

[43] PR Op. 48–50.

[44] JCH Op. 8.

[45] Judge James L. Dennis's opinion ("JLD Op.") 13–15 (quotation omitted); JCH Op. 10–11 (quotation omitted).

[46] JLD Op. 15; JCH Op. 11; *see* Oral Arg. 13:20–13:26.

[47] JLD Op. 13–15 (quotation omitted); JCH Op. 10–11 (quotation omitted). The allegation partially quoted at JLD Op. 15 does not support that the City provided "no training whatsoever." That allegation is the City had no First Amendment "policy" as to the Center. ROA.103 ¶ 55. A failure to train is "a separate theory of municipal liability" from failure to adopt a policy. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

Judge Richman dissented. She reasoned that Hershey inadequately alleged deliberate indifference under the single-incident exception. In her view, the consequences of the majority's failure-to-train holding are significant:

- it "radically expands" *Monell* liability;[48]

- it "permit[s] a broad swath of failure-to-train claims";[49]

- it "erode[s] and trivialize[s]" deliberate indifference;[50] and

- it "essentially imposes strict liability for a failure to train."[51]

After the opinion issued, a judge withheld the mandate. The City now petitions for rehearing en banc, limited to the failure-to-train holding.

---

[48]    PR Op. 22.

[49]    *Id.*

[50]    *Id.* 39.

[51]    *Id.* 43.

## III.   ARGUMENT

### A.   The panel majority's failure-to-train holding conflicts with precedents of this Court and the Supreme Court.

The Court should grant en banc rehearing for the independent reasons that the majority (1) broke with this Court's *Bustillos*[52] opinion by holding that the City can be deliberately indifferent to First Amendment rights that were not clearly established; and (2) diluted deliberate-indifference precedents by embracing what amounts to strict municipal liability for failure to train.

A municipality is not liable under § 1983 for failure to train employees unless the failure "amounts to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."[53] This is a "stringent standard of fault";[54] it is "more than negligence or even gross negligence."[55] To be deliberately indifferent, a municipality must "disregard[] a known or obvious consequence of

---

[52]   891 F.3d at 222. The City did not cite *Bustillos* in prior briefing. But it had no reason to: The magistrate judge dismissed the *Monell* claim for inadequately pleading the single-incident exception, and the City defended that reasoning before the panel. The need to cite *Bustillos* arose only when the panel majority disagreed and held that the City could be deliberately indifferent to a right the other majority held was not clearly established.

[53]   *City of Canton*, 469 U.S. at 388.

[54]   *Bryan Cnty.*, 520 U.S. at 410.

[55]   *Valle v. City of Hous.*, 613 F.3d 536, 547 (5th Cir. 2010) (citation omitted).

[its] action."[56] A "lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result [the Supreme Court] rejected in *Monell*."[57]

To establish deliberate indifference, a § 1983 plaintiff normally must prove a pattern of similar constitutional violations by untrained employees.[58] The reason is simple: A pattern of past constitutional violations provides notice of the need for training.[59] And without notice, a municipality "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[60]

In theory, a plaintiff who cannot establish a pattern of past violations can still establish deliberate indifference through the single-incident exception. "But that exception is extremely narrow."[61] It "is generally reserved for those cases in which the government actor was provided no training whatsoever."[62] And decisions "drawing the inference are rare"—so rare that, until this case, just a few published Fifth Circuit opinions had ever drawn that inference on a no-training-at-all theory.[63]

---

[56]    *Bryan Cnty.*, 520 U.S. at 410.

[57]    *City of Canton*, 489 U.S. at 392 (citation omitted).

[58]    *Connick*, 563 U.S. at 62.

[59]    *Id.*

[60]    *Id.*

[61]    *Henderson*, 51 F.4th at 131 (quotation omitted).

[62]    *Id.* (emphasis omitted) (quotation omitted).

[63]    *Garza*, 922 F.3d at 638 (citations omitted).

But an allegation of no-training-at-all is not enough to come within the single-incident exception here. A plaintiff invoking the single-incident exception must also allege "that the highly predictable consequence of a failure to train would result in the specific injury suffered."[64] And "[f]or a violation to be highly predictable, the municipality must have failed to train its employees concerning a *clear constitutional duty* implicated in recurrent situations that a particular employee is *certain to face*."[65]

The majority departed from these principles in at least two critical respects.

### 1. A municipality cannot be deliberately indifferent to constitutional rights that were not clearly established; the majority contravened that rule.

The first way the majority departed from deliberate-indifference precedent is by failing to heed this Court's instruction that a municipality cannot be deliberately indifferent to a constitutional right that is not clearly established.

This Court's *Bustillos* opinion required the majority to affirm the dismissal of Hershey's failure-to-train claim. *Bustillos* arose from body searches performed on a woman by county medical staff.[66] The woman sued the medical staff under § 1983

---

[64]     *Henderson*, 51 F.4th at 131 (quotation omitted).

[65]     *Id.* (emphasis added) (quotation omitted).

[66]     891 F.3d at 218.

and their municipal employer for failure to train them on such searches.[67] The district court held that the medical staff enjoyed qualified immunity because no clearly established law warned them that the search they performed was unlawful; the court then dismissed the failure-to-train claim as inadequately pled.[68]

This Court affirmed. The medical staff enjoyed qualified immunity based on the absence of clearly established law governing the searches.[69] And because no clearly established law governed the searches, the municipal employer could not have acted with deliberate indifference to the need to train its medical staff how to handle those searches.[70] Quoting Chief Judge Sutton, this Court underscored that "[a] policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established."[71]

*Bustillos* controls. Like the rights there, Hershey's rights were not clearly established. And so the City here, like the municipal employer there, cannot have acted with deliberate indifference. The bottom line is "a municipality cannot *deliberately*

---

[67] *Id.* at 218–19.

[68] *Id.* at 219.

[69] *Id.* at 222.

[70] *Id.*

[71] *Id.* (emphasis in original) (quoting *Hagans*, 695 F.3d at 511). The Court reserves the no-training-at-all theory for cases involving clearly established law. *E.g.*, *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 623–24 (5th Cir. 2018) (clearly established law of strip searches of students).

shirk a constitutional duty unless that duty is clear."[72] Because the majority held otherwise and broke from *Bustillos*, the full Court should correct course.

### 2. The majority substituted strict liability for deliberate indifference.

The majority departed from precedent in a second significant way: "essentially impos[ing] strict liability for a failure to train,"[73] as Judge Richman explained. Without notice that training on a topic is needed, a municipality cannot be deliberately indifferent for failing to train on that topic.[74] After all, deliberate indifference must "in fact be deliberate."[75] Were it otherwise, the "failure to train theory of liability could completely engulf *Monell*, imposing liability without regard to fault."[76]

That is what happened here. The majority held that the City could be liable for failing to train its officers and privately employed security guards on nuanced and unsettled First Amendment law applicable to a single forum—the Center—without any notice of a need to provide that training. Because "there was no notice 'at all' of

---

[72] *Arrington–Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) (Sutton, C.J.) (emphasis in original).

[73] PR Op. 23.

[74] *See Connick*, 563 U.S. at 62.

[75] *Arrington–Bey*, 858 F.3d at 995.

[76] *City of Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part).

the need to train for the specific First Amendment violation alleged," Judge Richman explained, the majority's no-training-at-all theory "results in strict liability."[77]

In all events, the majority's no-training-at-all theory fails on its own terms. As the magistrate judge and Judge Richman found, Hershey did not allege the City provided "no training whatsoever" on the First Amendment. His failure-to-train allegation was limited: He alleged the City did not "adequate[ly]" train on the First Amendment's application to the Center.[78] Because Hershey at most alleged "a failure to train in one limited area,"[79] the no-training-at-all line of cases cannot apply.

But even if that line of cases could apply in theory, it is not met on the facts alleged. For the no-training-at-all theory to apply, "the municipality must have failed to train its employees concerning a *clear constitutional duty* implicated in recurrent situations that a particular employee is *certain to face*."[80]

Two points preclude applying that theory here. First, a majority held that the First Amendment duties here were unclear in affirming the officers' entitlement to qualified immunity. And second, no allegation allows a reasonable inference that any

---

[77]    PR Op. 47.

[78]    ROA.108 ¶ 67, ROA.109 ¶¶ 67–70.

[79]    *Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009) (quotation omitted).

[80]    *Henderson,* 51 F.4th at 131 (emphasis added) (quotation omitted).

officer or guard "is certain to face" another professional pamphleteer paid to distribute literature outside a large, ticketed event at the Center.[81]

Because the majority's *Monell* holding essentially imposes strict liability— "substantially erod[ing] and trivializ[ing]"[82] the deliberate-indifference precedents of this Court and the Supreme Court—the Court should grant en banc rehearing.

**B.     The majority's errors present questions of exceptional importance.**

This case also merits en banc rehearing because the issues presented are recurring ones of substantial legal and practical importance.

Correctly applying and interpreting *Monell* and the deliberate-indifference standard is crucial. These are oft-litigated issues, and *Monell* cases are a major part of this Court's docket. In the last three years alone, this Court has issued over 100 opinions citing *Monell*.[83] But make no mistake: The impact of the majority's erroneous failure-to-train holding is not limited to municipal liability; that holding will also infect deliberate-indifference cases in other areas. For example, the Court evaluates supervisory liability of state actors under a deliberate-indifference standard.[84] So the majority's expansion of municipal liability expands supervisory liability, too.

---

[81]     *Id.* (quotation omitted).

[82]     PR Op. 39.

[83]     Per an October 16, 2025 WestlawEdge search.

[84]     *E.g.*, *Porter v. Epps*, 659 F.3d 440, 446–47 (5th Cir. 2011).

Another reason is practical. "[B]ecause many plaintiffs would be able to granulate allegations so finely that they arrive at a 'complete failure to train' as to the relevant conduct,"[85] the majority's holding will expose municipalities to burdensome discovery they could previously avoid through a Rule 12(b)(6) motion.

A final reason is more abstract but equally important: federalism. Lowering the bar for failure to train leads to "second-guessing municipal employee-training programs, thereby diminishing the autonomy of state and local governments."[86]

## IV.  CONCLUSION

The majority's failure-to-train holding clashes with Circuit and Supreme Court precedents. *Bustillos* holds that municipalities cannot be deliberately indifferent to constitutional rights that are not clearly established. And § 1983 forbids the strict-liability regime the majority's failure-to-train holding blessed. The Court should grant en banc rehearing limited to the majority's mistaken *Monell* holding.

---

[85]     PR Op. 42.

[86]     *Connick*, 563 U.S. at 74 (Scalia, J., concurring) (citation modified).

Respectfully submitted,

/s/ Thomas M. Flanagan

Layne A. Clark, Jr. (La. Bar 23686)    Thomas M. Flanagan (La. Bar 19569)
Reid A. Jones (La. Bar 34611)    Anders F. Holmgren (La. Bar 34597)
WIENER WEISS & MADISON APC    Jordan B. Redmon (La. Bar 37272)
330 Marshall Street, Suite 1000    FLANAGAN PARTNERS LLP
Shreveport, Louisiana 71101    201 St. Charles Avenue, Suite 3300
Tel: (318) 226-9100    New Orleans, Louisiana 70170
   Tel: (504) 569-0235

Counsel for Defendant–Appellee, City of Bossier City

## CERTIFICATE OF SERVICE

I certify that on October 21, 2025, I filed this petition for rehearing en banc with the Court's CM/ECF system, which will automatically send an electronic notice of filing to counsel of record.

/s/ Thomas M. Flanagan
Counsel for Defendant–Appellee,
City of Bossier City

# CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,883 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the program used to calculate the word count).

/s/ Thomas M. Flanagan
Counsel for Defendant–Appellee,
City of Bossier City

# APPENDIX: PANEL OPINION

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 7, 2025

Lyle W. Cayce
Clerk

No. 21-30754

Richard Hershey,

*Plaintiff—Appellant,*

*versus*

City of Bossier City; Bobby Gilbert, *Individually and in his Capacity as Deputy Marshal*; Daniel Stoll; David Smith; Tyshon Harvey; Eugene Tucker,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:21-CV-460

Before Dennis, Richman, and Ho, *Circuit Judges.*

Per Curiam:

    This is a splintered panel decision involving an individual's First Amendment right to distribute leaflets on the sidewalk on the grounds of CenturyLink Center. A majority of the panel (Judges Dennis and Ho) agrees to reverse the district court's dismissal of the *Monell*[1] claim against Bossier City for failure to train. A second majority (Judges Richman and

---

[1] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

No. 21-30754

Ho) agrees to affirm the grant of qualified immunity for the police officers and to affirm the dismissal of the security guards.

We AFFIRM in part and REVERSE in part the district court's judgment.

No. 21-30754

James C. Ho, *Circuit Judge*, concurring:

The First Amendment protects not just the right to pray, but to preach. To not only worship, but to witness. The right to exercise your religion includes the right to evangelize your faith.

And that's what's at issue in this case. Richard Hershey alleges that he wanted to distribute religious pamphlets on a public sidewalk while a concert was being held nearby—but that a group of police officers and security guards threatened to arrest him if he did so.

So I agree that we should remand Hershey's claim against the City of Bossier for failing to train its officers to respect the constitutional rights of its citizens.

Moreover, if it were up to me, his claims against the individual police officers and security guards would proceed to trial as well. Unfortunately, recent precedents of our court force us to grant qualified immunity.

To be sure, I strongly disagree with our court's approach to qualified immunity as applied in the First Amendment and other contexts. *See*, *e.g.*, *Villarreal v. City of Laredo*, 94 F.4th 374, 409 (5th Cir. 2024) (Ho, J., dissenting); *see also McMurry v. Weaver*, 142 F.4th 292, 304–7 (5th Cir. 2025) (Ho, J., concurring) (discussing *Villarreal* and *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011)). Likewise, I strongly disagree with our court's approach to the First Amendment as applied to acts of evangelism on public sidewalks outside a public amphitheater. *See*, *e.g.*, *Siders v. City of Brandon*, 130 F.4th 188, 191 (5th Cir. 2025) (Ho, J., dissenting from denial of rehearing en banc).

Our court's record of protecting First Amendment rights leaves much to be desired, to say the least. But as a member of this panel, I'm bound to faithfully follow our precedents, whether I agree with them or not. So I reluctantly concur in affirming the grant of qualified immunity, as compelled by our (mistaken) circuit precedent.

No. 21-30754

## I.

The First Amendment protects the "free exercise" of religion, not just the right to "worship." *Horvath v. City of Leander*, 946 F.3d 787, 795–96 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part). And "the right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978). "The dissemination of . . . religious views and doctrines is protected by the First Amendment." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

This right plainly encompasses the distribution of religious pamphlets—the activity at issue in this case. As the Supreme Court observed nearly a century ago, "[t]he hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses." *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943). "It has been a potent force in various religious movements down through the years," as people of faith "carry the Gospel to thousands upon thousands of homes and seek through personal visitations to win adherents." *Id.* at 108–9. "This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." *Id.* at 109.

So anyone who is "rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion." *Jamison v. Texas*, 318 U.S. 413, 416 (1943). "This right extends to the communication of ideas by handbills and literature as well as by the spoken word." *Id.*

## II.

Hershey's right to evangelize on a public sidewalk is not undermined by the fact that the city-owned facility abutting the sidewalk happens to be

managed by a private corporation. Nor should it matter that his rights were violated by private security guards working alongside police officers. Municipalities cannot abrogate the constitutional rights of their citizens simply by delegating their coercive governmental powers to private agents.

The Supreme Court addressed this very contention in *Marsh v. Alabama*, 326 U.S. 501 (1946). In *Marsh*, the Court was asked to answer the following question: "Can th[e] people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town?" *Id.* at 505. "For it is the State's contention that the mere fact that all the property interests in the town are held by a single company is enough to give that company power, enforceable by a state statute, to abridge these freedoms." *Id.*

The Court made clear that it "cannot accept that contention." *Id.* at 506. "Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free." *Id.* at 507. "The managers appointed by the corporation cannot curtail the liberty of press and religion of these people consistently with the purposes of the Constitutional guarantees." *Id.* at 508. "Many people in the United States live in company-owned towns. These people, just as residents of municipalities, are free citizens of their State and country." *Id.* "There is no more reason for depriving these people of the liberties guaranteed by the First and Fourteenth Amendments than there is for curtailing these freedoms with respect to any other citizen." *Id.* at 508–09.

Accordingly, the Court vacated the conviction of a member of Jehovah's Witnesses, for her only crime was leafletting on the sidewalks of the company town. *See id.* at 509 ("Insofar as the State has attempted to impose criminal punishment on appellant for undertaking to distribute

religious literature in a company town, its action cannot stand."). *See also Lee v. Katz*, 276 F.3d 550, 557 (9th Cir. 2002) (private lessee of public plaza cannot violate the First Amendment rights of street preachers).

Like Grace Marsh, Richard Hershey's First Amendment rights should not depend on whether he was ejected by a cop or a contractor. He alleges that private security guards assisted the police in ejecting him from the area. So he has stated a cognizable claim against "[p]rivate persons" who "jointly engaged with state officials in the prohibited action." *United States v. Price*, 383 U.S. 787, 794 (1966).

## III.

All of this *should* have been amply sufficient to defeat qualified immunity at this preliminary stage of the proceedings—and to allow Hershey to proceed to trial.

After all, the Supreme Court has repeatedly denied qualified immunity where it found the constitutional violation so "obvious" that it didn't require the plaintiff to identify factually indistinguishable case law. *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("general statements of the law . . . may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful") (cleaned up) (quoting *United States v. Lanier*, 520 U.S. 259, 270–71 (1997), and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Taylor v. Riojas*, 592 U.S. 7, 8–9 & n.2 (2020) (citing *Hope* and *Lanier*) (summarily reversing our court's grant of qualified immunity due to the "obviousness" of the constitutional violation).

Under *Hope* and *Taylor*, it should be enough to defeat qualified immunity that the alleged constitutional violation is obvious. And this "obviousness" principle should be intuitive to all who treasure our constitutional rights. As then-Judge Gorsuch put it, "some things are so

obviously unlawful that they don't require detailed explanation." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). "[S]ometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Id.* "[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Id.* at 1082–83.

I most certainly agree. To my mind, "[i]t seems absurd to suggest that the most egregious constitutional violations imaginable are somehow immune from liability precisely because they're so egregious. It would make a mockery of our rights to grant qualified immunity just because no one in government has yet to be abusive enough to commit that particular violation—and then stubborn enough to litigate it, not only before a district court, but also in the court of appeals (or the Supreme Court)." *McMurry*, 142 F.4th at 304 (Ho, J., concurring).

## A.

But here's the problem: In our circuit, *Hope* and *Taylor* apply only to the Eighth Amendment claims of incarcerated criminals. They do not apply to the First Amendment claims of law-abiding citizens. That's because of our decision in *Villarreal*.

In *Villarreal*, the majority acknowledged that *Hope* and *Taylor* denied qualified immunity based on "obvious" and "particularly egregious" constitutional violations—and did so without requiring a "fact-specific[]" presentation of case law. 94 F.4th at 395. But the majority distinguished those decisions on the ground that they're "Eighth Amendment cases" that establish only a "narrow[] obviousness exception" that should not apply to obvious violations of the First Amendment. *Id.* It claimed support in our earlier en banc decision in *Morgan*, 659 F.3d 359. *Contra id.* at 412, 414 n.30

(Elrod, J., dissenting in part) (concluding that *Hope* applies to obvious First Amendment violations).

*Villarreal* has been widely criticized. *See McMurry*, 142 F.4th at 305–06 (Ho, J., concurring) (surveying criticism). And the Supreme Court has vacated it. *See Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). But our court has now reinstated it. *See Villarreal v. City of Laredo*, 134 F.4th 273, 276 (5th Cir. 2025) ("[o]ur previous en banc majority opinion is superseded only to th[e] extent" necessary to respond to the Supreme Court's vacatur regarding the substantive requirements of a First Amendment retaliation claim).

So it doesn't matter how obvious a First Amendment violation might be demonstrated at trial. To overcome qualified immunity under *Villarreal*, the plaintiff must satisfy "the requirement that 'clearly established law' be founded on materially identical facts." 94 F.4th at 395.

## B.

Hershey has been unable to identify favorable precedent with the "materially identical facts" required by *Villarreal*. *Id.*

So I'm forced to conclude that qualified immunity must be granted—to both cops and contractors alike. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 393–94 (2012) (holding that private individuals temporarily retained by the government may invoke qualified immunity); *Meadows v. Rockford Hous. Auth.*, 861 F.3d 672, 678 (7th Cir. 2017) (extending qualified immunity to private security guards performing governmental functions).

In fact, the closest case in recent years is profoundly unfavorable to people of faith. In *Siders*, we rejected a First Amendment challenge to a local ordinance that prevented citizens from distributing religious materials on a sidewalk outside a public amphitheater. *See Siders v. City of Brandon*, 123 F.4th 293 (5th Cir. 2024).

No. 21-30754

I strongly disagree with that ruling. *See Siders*, 130 F.4th at 191 (Ho, J., dissenting from denial of rehearing en banc). But our court denied rehearing en banc in that matter by a lopsided vote.[2]

So I'm bound by *Siders*. To be sure, *Siders* was decided at the preliminary injunction stage. So in theory, I suppose that Siders could still prevail on the merits. But regardless of how *Siders* is ultimately decided on the merits, it seems difficult to see how Hershey has stated a "clearly established" violation in our circuit, when another panel of our court (wrongly) found a similar claim unlikely to succeed on the merits in *Siders*. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (to find a "clearly established" violation, "existing precedent must have placed the statutory or constitutional question beyond debate"); *see also Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. _, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring) ("Of course, decisions regarding interim relief are not necessarily conclusive as to the merits because further litigation may follow. But regardless of a decision's procedural posture, its reasoning—its *ratio decidendi*—carries precedential weight in future cases.") (cleaned up).

---

[2] Several members of the court tried to defend the panel ruling in *Siders* by recharacterizing it. That is, they theorized that the challenged ordinance did not actually prevent any citizen from evangelizing on public grounds. *See, e.g.*, *id.* at 189 (Oldham, J., concurring in the denial of rehearing en banc) ("the ordinance does not purport to regulate prayer, conversation, t-shirts, evangelism, or tracts").

But this rationalization effort is hard to reconcile with what several members of the court said in the companion case of *Olivier v. City of Brandon*, 121 F.4th 511 (5th Cir. 2024). *See, e.g.*, *id.* at 512 (Ho, J., dissenting from denial of rehearing en banc, joined by six members of the court) (condemning same local ordinance at same public amphitheater because it prevents "an evangelical Christian who feels called to share the good news with his fellow citizens . . . from doing so outside the city's public amphitheater").

**C.**

Qualified immunity, of course, only applies to the damages claim against the individual Defendants.  Qualified immunity does not bar claims for injunctive relief.  But Hershey's appeal appears to be focused only on damages, and not injunctive relief.

**IV.**

I turn now to Hershey's claim that the City of Bossier failed to train its officers to respect the constitutional rights of its citizens.

Under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), municipalities may be held liable for constitutional violations.  A failure to train officers to respect constitutional rights, including those protected by the First Amendment, "can without question give rise" to this liability.  *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009).

To establish *Monell* liability on a failure to train theory, a plaintiff must allege that the municipality had inadequate training procedures and was deliberately indifferent in adopting them, and that the failure to train caused the violation in question.  *See id.*

Although deliberate indifference is usually inferred "from a pattern of constitutional violations," we will also infer it where "the policymaker provides no training whatsoever with respect to the relevant constitutional duty."  *Garza v. City of Donna*, 922 F.3d 626, 637–38 (5th Cir. 2019) (internal quotation marks omitted).

That's exactly what Hershey alleges here.  His complaint contends that Bossier City did not train its police officers and private security personnel that the park surrounding the Bossier City Arena is public property, or that citizens are entitled to exercise their First Amendment

No. 21-30754

rights there.  Moreover, at oral argument, counsel for Hershey agreed that the officers "received literally zero training" on First Amendment issues. Oral Arg. at 13:20–13:26.  If these facts are true, they show that the City provided "no training whatsoever" regarding the application of the First Amendment to the park. *Garza*, 922 F.3d at 638.  They are "facts sufficient to show" that the city acted with deliberate indifference. *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

Hershey also alleges that the City's failure caused the violations of his rights.  He contends that the City's failure to inform officers that the park was public property led officers to believe that the park was private property, and that citizens could therefore be ejected without regard to the First Amendment.  He alleges that the officers who removed him from the park held this belief, and told him he had to leave the park because it was private property.  In sum, he pled facts sufficient to show that the City's complete lack of training was the cause of his injury.

* * *

I agree that Hershey's *Monell* claim against the City of Bossier may proceed.  I reluctantly concur that, under our court's current precedent, qualified immunity disposes of his claims against the individual Defendants.

No. 21-30754

James L. Dennis, *Circuit Judge*, concurring in part and dissenting in part:

Richard Hershey peacefully distributed free pamphlets about Christian vegetarianism on the public sidewalks outside the city-owned CenturyLink Center in Bossier City, Louisiana. The surrounding streets and sidewalks are part of a public park, open and unrestricted to the public. At the same time, another person handed out commercial advertisement cards for an internet radio station. Two City police officers—Deputy City Marshal Bobby Gilbert and Officer Daniel Stoll—and three Center security guards—David Smith, Tyshon Harvey, and Eugene Tucker—approached only Hershey and told him to stop leafletting. They waved handcuffs at Hershey and warned that if he continued, they would arrest him. Hershey attempted to explain that he had a legal right to hand out his literature, but Deputy Marshal Gilbert cut him off and told him that he was on private property, he had to leave or face arrest, and he could not return.

As Hershey was leaving, he inquired about the commercial literature being distributed by the person working for the internet radio station. Security guard Harvey responded that Hershey's literature had not been "approved" by the Center, and that Hershey had to submit his literature in advance. When Hershey repeated his question, Harvey said he did not know whether the radio station's commercial literature had been approved, but because Hershey's had not, he needed to leave. The officers and security guards then "used their command presence to assist in the removal of Hershey from the park." Hershey left without handing out more literature and has not returned because he fears arrest and jail. The officers did not remove the other leafleteer.

Hershey sued the City, the officers, and security guards, alleging that they violated his First Amendment rights by evicting him. The district court dismissed his claims at the Federal Rule of Civil Procedure 12(b)(6) stage,

No. 21-30754

ruling that (1) the officers were entitled to qualified immunity because Hershey failed to show that the law clearly established his right to distribute literature free from viewpoint discrimination in a traditional public forum; (2) the security guards did not qualify as state actors under 42 U.S.C. § 1983; and (3) Hershey did not allege a municipal policy or custom that could make the City liable under *Monell*.[3]

In my view, the district court erred in dismissing Hershey's *Monell* failure to train claim. Hershey sufficiently pleaded facts to show the City was deliberately indifferent to the violation of his First Amendment rights when it provided no training whatsoever as to an officer's duties under the First Amendment. We reverse on this claim, described more fully in Part A below.

For the officers and security guards, Judge Richman and Judge Ho affirm across the board. Judge Richman's opinion (the PR Opinion) reasons that Hershey failed to meet the clearly established prong of the qualified immunity analysis against the police officers and failed to demonstrate the security guards were acting under the color of state law for purposes of § 1983. I respectfully dissent. Because the law clearly established Hershey's right to leaflet in a traditional public forum without viewpoint discrimination, qualified immunity is inappropriate. *See* Part B. And Hershey plausibly alleged that the security guards acted under color of state law when they exercised the public function of policing. *See* Part C.

A

The district court erred by dismissing Hershey's *Monell* failure to train claim against the City. "A municipality's failure to train its police officers can without question give rise to § 1983 liability." *World Wide Street Preachers*

---

[3] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

No. 21-30754

*Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009) (citations omitted). To prevail on a "failure to train theory," a plaintiff must demonstrate that (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the violations in question. *Id.*

Hershey has sufficiently alleged the first element—that the City's training procedures were inadequate. The City failed to train its officers that the Center and its surrounding area were public property, that the adjacent streets and sidewalks were a traditional public forum, and, therefore, that citizens were entitled to exercise their free speech rights there. Because of this failure to train, the officers mistakenly believed that the Center was private property. The first element is satisfied.

Under the second element, "[d]eliberate indifference may be inferred either from a pattern of constitutional violations or, absent proof of a pattern, from 'showing a *single incident* with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights.'" *Garza v. City of Donna*, 922 F.3d 626, 637–38 (5th Cir. 2019) (emphasis added) (citation modified). "The latter inference 'is possible only in very narrow circumstances' because we have 'generally reserved the single-incident method . . . for cases in which the policymaker provides *no training whatsoever* with respect to the relevant constitutional duty, as opposed to training that is inadequate only as to the particular conduct that gave rise to the plaintiff's injury.'" *Id.* at 638 (emphasis added) (citation modified).

Hershey's allegations fall within the latter "narrow circumstances" because he alleged the City completely failed to train officers on their First Amendment duties. The PR Opinion characterizes the failure to train

claim here as a failure to train "in one limited area"—the particular conduct giving rise to the plaintiff's injury—rather than a complete failure to train officers on the First Amendment. But this misconstrues the allegations in Hershey's complaint. Hershey alleged the City "did not have *any* policy . . . regulating speech activities protected by the First Amendment." Hershey alleged the City failed to train its police officers and private security personnel of citizens' First Amendment rights on public property, including the area surrounding the Center. At oral argument, counsel for Hershey confirmed that the officers "received literally zero training" on First Amendment issues. The complaint backs this up. Taking these facts as true, the City provided "no training whatsoever" regarding the First Amendment's application to speech in traditional public forums. *See Garza*, 922 F.3d at 638. These are "facts sufficient to show" that the City was deliberately indifferent to the deprivation of Hershey's First Amendment rights. *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

The PR Opinion, relying on *Garza*, argues that the need for training was not "obvious" because "this is a case in which only a few individuals violated" First Amendment rights "on one occasion," and there is "no evidence" to infer any subsequent incidents relevant to the City's failure to train. But *Garza* was decided on summary judgment with the benefit of a developed record. And the failure to train claim in *Garza* was based on a theory of inadequate training in a jail, rather than a theory of no officer training whatsoever on the First Amendment. At the motion-to-dismiss stage, Hershey has alleged that the City's complete lack of training directly caused the First Amendment violation in question. At this stage, entirely failing to train officers about their duties under the First Amendment will predictably and obviously result in recurring violations of citizens' First Amendment rights. This is sufficient to allege deliberate indifference.

No. 21-30754

Finally, Hershey plausibly alleged that the City's failure to train caused the violation at issue. The City's failure to train officers that the park was a public forum led officers to believe that the park was private property and that citizens could be ejected without violating their First Amendment rights. Hershey also alleged that the officers who removed him from the park held this belief and told him he had to leave the park because it was private property. Hershey has pleaded facts sufficient to show that the City's complete lack of training was the cause of his injury.

Hershey has stated a plausible failure to train claim against the City, and the district court erred in dismissing his *Monell* claim.

## B

I depart from the majority on all remaining issues, beginning with the grant of qualified immunity to the police officers at the Rule 12(b)(6) stage. Qualified immunity requires two inquiries: first, whether the officer violated a constitutional right; and second, whether that right was clearly established at the time of the misconduct. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). The PR Opinion collapses the inquiries to ultimately conclude Hershey cannot meet the clearly established prong. But taking the allegations in the complaint as true, as we must, Hershey satisfies both prongs: viewpoint discrimination, regardless of forum, violates the First Amendment, and the right to be free from viewpoint discrimination is clearly established.

Because the law governing speech depends on the forum, the threshold question is whether Hershey leafletted in a traditional public forum. Public sidewalks and parks fall squarely into that category. *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018). Courts must assess the property at issue based on its particular facts. *Brister v. Faulkner*, 214 F.3d 675, 681–83 (5th Cir. 2000). "The location and purpose of a publicly owned sidewalk is critical" to forum analysis. *United States v. Kokinda*, 497 U.S. 720,

No. 21-30754

729–30 (1990). We also consider whether the property is "indistinguishable from . . . [a] city sidewalk." *Brister*, 214 F.3d at 683. Because forum status turns on factual circumstances, it rarely lends itself to resolution on a Rule 12(b)(6) motion. *See Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988).

The PR OPINION reasons that sidewalk status was not clearly established, relying on *Powell v. Noble*, 798 F.3d 690, 700 (8th Cir. 2015), which treated fairground sidewalks as a limited public forum. But *Powell* arose on appeal from a preliminary injunction, where the court conducted a fact-intensive review of congestion, signage, police presence, and fencing at the fair. *Id.* That context does not exist here. The PR OPINION nonetheless imports *Powell*'s fact-finding into this Rule 12(b)(6) posture, citing contractual arrangements and event management at the Center.

Hershey, however, distributed literature on a public sidewalk within a public park, where public streets and sidewalks led directly to the Center, and no gates or restrictions blocked access. The district court agreed those allegations sufficed to plead that the sidewalk qualifies as a traditional public forum, and neither party disputes that point. At this stage, we must take Hershey's allegations as true. *Brister*, 214 F.3d at 683. By discounting them, the PR OPINION departs from our Rule 12(b)(6) standard.

The second step asks what kind of restriction Hershey faced. The officers stopped him from distributing religious literature while allowing another individual to distribute commercial handbills. Harvey, the security guard, told Hershey that leaflets required advance approval, but admitted he did not know whether the other leafleteer had approval. The district court correctly recognized that Hershey's allegations raised a plausible inference of viewpoint discrimination. Neither party disputes that characterization.

The PR OPINION instead faults Hershey for not alleging what happened after he left—for example, whether the other leafleteer stayed for a "substantial period of time." But Rule 12(b)(6) requires only well-pleaded allegations of unequal treatment, which Hershey provided. His complaint plausibly alleged that the officers engaged in viewpoint discrimination in violation of the First Amendment.

The district court nevertheless held that the right was not clearly established. That conclusion was error. The Supreme Court and this court have long recognized that viewpoint-based restrictions violate the First Amendment in any forum. *See, e.g.*, *Chiu v. Plano I.S.D.*, 260 F.3d 330, 350 (5th Cir. 2001); *Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992); *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). We have also refused to grant qualified immunity at the motion-to-dismiss stage when plaintiffs plausibly alleged viewpoint discrimination. *See Biggers v. Massingill*, No. 23-11023, 2025 WL 429974, at *2–3 (5th Cir. Feb. 7, 2025).

The PR OPINION leans on *Morgan v. Swanson*, 755 F.3d 757 (5th Cir. 2014), which warned that the general prohibition against viewpoint discrimination does not always give officials sufficient notice. But *Morgan* involved the interplay of the Establishment Clause, the Free Speech Clause, and school speech—a uniquely complex setting. *Id.*; *see also Morgan v. Swanson*, 659 F.3d 359, 364 (5th Cir. 2011) (en banc). This case is simpler: Hershey peacefully distributed free Christian literature on a public sidewalk while another individual handed out commercial flyers. The officers forced Hershey to leave but allowed the other to continue. Construing his allegations in his favor, Hershey pleaded a straightforward claim of viewpoint discrimination in a traditional public forum.

Qualified immunity does not protect blatant viewpoint discrimination. Any reasonable officer would have understood that ejecting Hershey while

permitting another leafleteer to remain violated the First Amendment. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Because Hershey has alleged both a constitutional violation and the violation of a clearly established right, reversal of the district court's grant of qualified immunity is warranted.

## C

I also disagree that security guards Smith, Harvey, and Tucker were not acting under the color of state law when they removed Hershey from the public sidewalks outside the Center. Policing free speech in a traditional public forum is a traditional and exclusive function of the state or municipal government—such that it constitutes state action.

Smith, Harvey, and Tucker were employees of ASM Global, a private company, not the state. "[M]ere[] private conduct, no matter how discriminatory or wrongful," is generally excluded from § 1983's reach, unless the private conduct is fairly attributable to the state. *Richard v. Hoechst Celanese Chem. Grp.*, 355 F.3d 345, 352 (5th Cir. 2003). There are three tests that provide exceptions to the general rule: the public function test, the nexus test, and the joint action test. *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549–50 (5th Cir. 2005). Relevantly here, "[u]nder the public function test, a 'private entity may be deemed a state actor when that entity performs a function which is traditionally the exclusive province of the state.'" *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241–42 (5th Cir. 1999) (quoting *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989)); *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) ("[T]o qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally and exclusively performed the function.").

This case involves officers regulating free speech in a traditional public forum through policing, which is an exclusive function of the state or

municipal government. If, as in this case, that responsibility is delegated to a private entity, the private actors' conduct remains state action. *Foley v. Connelie*, 435 U.S. 291, 297 (1978) (describing the "police function" as "a description of one of the basic functions of government"); *Brown v. Maryland*, 25 U.S. 419, 443 (1827) ("[P]olice power, which unquestionably remains, and ought to remain, with the States."). Several circuits have determined private security guards were state actors when delegated exclusive police powers. *Romanski v. Detroit Ent., LLC*, 428 F.3d 629, 637 (6th Cir. 2005); *see also Payton v. Rush–Presbyterian*, 184 F.3d 623, 630 (7th Cir. 1999).

The security guards, in overseeing City property, were for all purposes acting as de facto police officers. Harvey, Smith, and Tucker surrounded Hershey during the initial encounter alongside the police officers, and they used their command presence to remove Hershey from the scene. Harvey was the one explaining the allegedly unconstitutional speech regulations to Hershey as he was ejected, not a police officer. The actions taken by the police officers and the security guards were one and the same.

Further, Hershey alleged that the City employs a policy of allowing their officers and security guards to "use their unfettered discretion to arbitrarily and capriciously remove individuals who are peacefully exercising their First Amendment rights," because the Center "does not have any written or official policy prohibiting, regulating or licensing the distribution of leaflets on its grounds." In allowing the security guards to use their discretion to decide which types of speech are permissible, the City has empowered private security guards who patrol its property to regulate speech with no oversight.

Taking all well-pleaded facts as true and in the light most favorable to him, Hershey has sufficiently alleged that the individual security guards were

No. 21-30754

state actors under the public function test.[4] The district court erred in dismissing Hershey's § 1983 claims against Smith, Harvey, and Tucker.

\*     \*     \*

In sum, the panel affirms the district court's judgment in part and reverses it in part. As to Hershey's *Monell* claim, Judge Ho and I hold that the district court reversibly erred. Judge Richman dissents. As to the district court's dismissal of Hershey's claims against the City officers and Center security guards, Judges Richman and Ho affirm. I respectfully dissent as to those issues.

---

[4] A wholly different version of the facts may be presented as the case progresses to trial. But taking all well-pleaded facts as true and in the light most favorable to him, Hershey has sufficiently alleged that the individual security guards were state actors at this juncture.

No. 21-30754

Priscilla Richman, *Circuit Judge*, concurring in part and dissenting in part:

With great respect, the panel majority radically expands *Monell*[1] municipal liability in at least two unprecedented and unwarranted respects: (1) by sanctioning a "gotcha" claim based on "failure to train at all"; and (2) by holding that a municipality is liable for failure to train security guards *hired by a private entity* that leases and operates property owned by the municipality.

First: This is a single-incident case. It involves nuanced First Amendment law. Instead of adhering to the boundaries that limit the "very narrow circumstances" in which courts will permit an inference of deliberate indifference to be drawn from "an obvious potential for violation of constitutional rights,"[2] the separate opinions of Judge Dennis and Judge Ho open the door to permit a broad swath of failure-to-train claims to defeat a municipality's qualified immunity.

The Supreme Court has made clear that municipal liability based on *Monell* requires deliberate indifference.[3] Deliberate indifference may be inferred in failure-to-train-at-all cases "in a narrow range of circumstances" if the violation of federal rights is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."[4] The Supreme Court emphasized that whether such a consequence is "obvious" depends on "[t]he likelihood that the situation

---

[1] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[2] *Garza v. City of Donna*, 922 F.3d 626, 637-38 (5th Cir. 2019).

[3] *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

[4] *Bd. of Cnty. Commissioners of Bryan Cnty. v. Brown*, 520 U.S. 397, 409-410 (1997).

No. 21-30754

will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[5]

There is no allegation in this case that viewpoint discrimination by a Bossier City law enforcement officer against someone engaging in free exercise of religion or free speech has ever previously occurred. It is not highly predictable that law enforcement officers would have recurring encounters with individuals paid to distribute literature outside a large, ticketed event and that, absent training about what is "public" versus "private" property and viewpoint discrimination, those officers would discriminate based on the content of the literature being distributed. JUDGE DENNIS's and JUDGE HO'S opinions say that if a city fails to train "at all" regarding the First Amendment, then it is "obvious" that a constitutional violation will occur. This not only permits liability for what may be, at most, mere negligence, it essentially imposes strict liability for a failure to train.

Second: Perhaps even more remarkably, JUDGE DENNIS's and JUDGE HO's opinions say a municipality can be liable for failure to train private security guards who are hired by a private entity for an event at an arena it has leased from the municipality and operates. Hershey has alleged that Bossier City should have trained private security personnel who were engaged for a large concert event and that Bossier City is liable for that failure to train. The panel's majority opinions allow this claim to proceed on the basis that it was obvious Bossier City needed to train security guards hired by a third party, even though the law is far from clear that a city has a duty to train security guards.

As to the liability of the individual defendants in this case (Bossier City law enforcement officers and private security guards), JUDGE HO and I agree

---

[5] *Id.*

23

No. 21-30754

that the district court did not err in dismissing the claims against them, though our views as to why are not congruent.

I would affirm the district court's judgment in all respects. I therefore concur in part and dissent in part.

## I

The City of Bossier City, Louisiana owns a multi-purpose arena (which I will call the Center), formerly known as CenturyLink Center, and also Bossier City Arena. It is currently known as Brookshire Grocery Arena. The Center has been the site of sporting events, such as NBA and NCAA basketball games, and an NHL hockey game.[6] The forum has hosted well-known entertainers including, but not limited to, Paul McCartney, Elton John, Taylor Swift, Cher, Carrie Underwood, Justin Timberlake and Miranda Lambert, to name a few.[7]

The Center is located in a public park. At the time relevant to this litigation, the Center was managed by ASM Global, a private entity. ASM Global leased both the interior space and outdoor areas of the Center for events. On February 28, 2020, the Center hosted a Christian rock concert known as Winter Jam. Guests paid to attend.

Hershey's Amended Complaint alleges that he is a vegetarian and that on the day of the Winter Jam concert, he was distributing "free, educational, noncommercial, religious booklets on behalf of a nonprofit organization named the Christian Vegetarian Association." He is paid "by various nonprofit organizations for his advocacy and distribution of literature." He

---

[6] *See Brookshire Grocery Arena*, Wikipedia, https://en.wikipedia.org/wiki/Brookshire_Grocery_Arena (last visited October 6, 2025).

[7] *Id.*

No. 21-30754

further alleges that he was peacefully engaging in leafleting activity when he was approached by Bossier City Deputy Marshal Bobby Gilbert, Bossier City police officer Daniel Stoll, and three private security agents (David Smith, Tyshon Harvey, and Eugene Tucker) employed by ASM Global.

Hershey's Amended Complaint asserts he was told by Deputy Marshal Gilbert that he was on private property and that "he had to leave, that he would be arrested if he did not leave." Hershey alleges that another person was handing out cards for a radio station, for a commercial purpose, but that person had not been asked to leave when Hershey was approached by the Bossier City officers and ASM Global security guards. Hershey says he was told he had to leave the area because he had not obtained authorization to distribute booklets ahead of time. Hershey alleges he inquired about the person distributing cards for a radio station and was told essentially, "We don't know whether he [that other person] has permission." Hershey left the premises and was not arrested.

He brought this suit, alleging § 1983 claims against the City law enforcement officers, the private security guards, and Bossier City. Hershey asserts in his briefing that he was subjected to viewpoint discrimination. He also alleges that each of the ASM Global security guards was "a willing participant in joint action with state actors."

In framing his claims, Hershey repeatedly alleges that the Center and the areas surrounding it are public property, or in the alternative, that the disputed area is a designated public forum. Hershey asserts in his briefing that he was asked to leave based on his or the leaflets' viewpoint. He further alleges that Bossier City failed to train its officers and ASM Global's security guards about the public nature of the property and attendant First Amendment considerations. He asserts that the Bossier City officers and private security personnel whom he encountered engaged in viewpoint

discrimination and should be liable because Hershey was on public, not private, property.

Hershey also alleges that Bossier City "has a long-standing custom of allowing police officers, employees and/or officials of CenturyLink Center to use their unfettered discretion to arbitrarily and capriciously remove individuals who are peacefully exercising their First Amendment rights from the CenturyLink property." However, he does not allege that Bossier City officials or officers or private security personnel have ever removed anyone from the Center or the surrounding property who was peacefully exercising their First Amendment rights, other than himself.

Almost a year after the incident in question, Hershey's attorney contacted ASM Global and was told in an email, which is attached as an exhibit to Hershey's Amended Complaint, that ASM Global's policies regarding the Center are as follows:

> If the public would like to engage in a peaceful protests [sic] or distribution of pamphlets, they are free to do so as long as it does not interfere with the safe ingress or egress of guests. This is especially important when the facility and property has been exclusively leased for an event.
>
> In addition, CenturyLink Center has instituted a CODE OF CONDUCT which must be adhered to while on the premises. This Code of Conduct (copy inserted) is posted on our website under Arena Info.

Hershey's counsel had also asked for an "incident report" regarding the day Hershey was told to leave the area near the Center, which was February 28, 2020. The author of the ASM Global email responded:

> I did see an incident report from 2/28/2020, that states "Security Observed two individuals handing out pamphlets in the Parking Lots A & D. The individuals became

No. 21-30754

argumentative and Security called for Bossier City Police for assistance." It further states the Pamphleteers then left the property. (It does not state they were removed.)

I, myself, remember this incident, as I heard the call over the radio for police assistance and went to the area. When I arrived, I saw police talking with two people. I did not interject. Our security guards (ASM Global employees) told me that two people with pamphlets were shouting at our guests in line that they were going to Hell for attending this event, and that it made a few "children" cry. It is my understanding that the Police asked the pamphleteers to stop upsetting the guests and that they left of their own accord.

I see no other documentation or incidents pertaining to the subject of your request.

It is unclear whether the "incident report" in this email or the events recounted in that email involved Hershey.

As the magistrate judge's report reflects, this is not the first time Hershey has had an encounter that has given rise to First Amendment litigation.[8] Hershey is a serial plaintiff.

---

[8] *See* ROA.130 n.1, which reflects:

*Hershey v. Jasinski et al*, United States District Court, Western District of Missouri, St. Joseph Division, Docket No. 20-06088-CV-W-BP; (2) *Hershey v. Turner*, No. CIV-19-344-SPS, 2020 WL 1932911 (E.D. Okla. Apr. 21, 2020); (3) *Hershey v. Kansas City Kansas Cmty. Coll.*, No. 2:16-CV-2251-JTM, 2017 WL 661581 (D. Kan. Feb. 17, 2017); (4) *Hershey v. Goldstein*, 938 F. Supp. 2d 491 (S.D.N.Y. 2013); (5) *Hershey v. Multi-Purpose Civic Ctr. Facility Bd. for Pulaski Cty., Arkansas*, No. 4:18-CV-00476 BSM, 2020 WL 4741900 (E.D. Ark. Aug. 14, 2020);(6) *Hershey v. Walker*, No. 4:12CV01603 ERW, 2013 WL 657873 (E.D. Mo. Feb. 22, 2013); (7) *Hershey v. Thomas et al*, United States District Court, Eastern District of Arkansas, Central Division, Docket No. 4:20-cv-01397-KGB; (8) *Hershey v. Junior College District of St. Louis-St. Louis County et al*, United States District Court, Eastern District of Missouri, Docket No.

No. 21-30754

The defendants moved to dismiss the suit. The magistrate judge prepared a detailed report and recommendations, recommending dismissal based on qualified immunity and for failure to state a claim. The district court agreed with those recommendations and dismissed the suit.

## II

Hershey's first contention on appeal is that Marshal Gilbert and Officer Stoll are not entitled to qualified immunity because the right to be free from viewpoint discrimination was clearly established on February 20, 2020, the date the incident in question occurred. The magistrate judge concluded otherwise, and after a conducting a de novo review, the district court agreed with the magistrate judge.

Hershey maintains that based on First Amendment law, the Center is a traditional public forum or, in the alternative, that it is a designated public forum. The magistrate judge's report reasoned that only the sidewalks outside the arena are at issue, and that some decisions have held that sidewalks outside an arena are either nonpublic or limited forums. Ultimately, the magistrate judge concluded

> Plaintiff does not point to a single decision from any court that has held, before or after the date of this incident, that

---

4:10-cv-1116; (9) *Hershey v. The Curators of University of Missouri et al,* United States District Court, Eastern District of Missouri, Docket No. 4:16-cv-1229; (10) *Hershey v. Junior College District of Central Southwest Missouri et al,* United States District Court, Western District of Missouri, Docket No. 6:14-cv-3375; (11) *Hershey v. The Curators of the University of Missouri, et al,* United States District Court, Western District of Missouri, Central Division, Docket No. 2:20-cv-04239-BCW; (12) *Hershey v. Oldham, et al,* United States District Court, Middle District of Tennessee, Docket No. 2:20-cv-0012; (13) *Hershey v. Oldham*, et al, United States District Court, Middle District of Tennessee, Docket No. 2:20-cv-0264.

No. 21-30754

an officer violated the rights of a leafleteer who was removed from a similar arena premises. The discussions above demonstrate that there are many nuances to First Amendment claims of this nature, beginning with questions about the category of the forum and continuing through the reasonableness of various regulations or restrictions. Very little about this field of law is clearly established.

I agree with the magistrate judge and the district court.

The Supreme Court has explained that "[t]he standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum."[9] The Eighth Circuit has explained, for example, that "[l]imited public forums (sometimes called nonpublic forums) include public properties that are not by tradition or designation public forums but have been opened by the government for limited purposes, communicative or otherwise."[10] That court further explained that "[t]he government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated."[11] "'[T]he location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.'"[12] The Eighth Circuit concluded that sidewalks serving the purpose of admitting thousands of people to a state fair were a limited public forum.[13] It held that restrictions on speech in a limited public

---

[9] *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001).

[10] *Powell v. Noble*, 798 F.3d 690, 699 (8th Cir. 1997) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985)).

[11] *Id.* at 699-700 (quoting *United States v. Grace*, 461 U.S. 171, 178 (1983)).

[12] *Id.* (quoting *United States v. Kokinda*, 497 U.S. 720, 728–29 (1990) (plurality opinion)).

[13] *Id.* at 700.

forum must be reasonable and viewpoint neutral.[14]  It further held that the plaintiff in that case was not likely to prevail on his claim that his First Amendment rights were violated when he was prohibited from holding a pole with a poster-sized sign on it while on sidewalks near entrances to a state fair.[15]

JUDGE DENNIS's opinion notes that the Eighth Circuit's decision in Powell was reached only after the court held a preliminary injunction hearing and "conducted a fact-intensive review of congestion, signage, police presence, and fencing at the fair."[16]  It was only then, JUDGE DENNIS's opinion posits, that the court was able to conclude that the law was not clearly established as to the character, for First Amendment purposes, of the area in which the plaintiff had displayed his sign.[17]  But this discussion exemplifies the whole point of qualified immunity.  First, *Powell* was, as noted, a preliminary injunction case.  Qualified immunity is not a defense to injunctive relief.  The present case is a suit for damages.  Second, we do not hold officers like the individual defendants in the present case liable for damages after we conduct a hearing to determine, in hindsight, whether they property they were policing was a public forum.  Our inquiry is whether the law was clearly established when the defendant acted or failed to act.  Third, we cannot expect officers, even those trained in First Amendment law, to know whether

---

[14] *Id.* (citing *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 (2010) ("Recognizing a State's right to preserve the property under its control for the use to which it is lawfully dedicated, the Court has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral.")).

[15] *Id.* at 701-02.

[16] *Ante* at 17.

[17] *Id.*

No. 21-30754

a given area near an arena being used in a particular way at a given time is or is not a public forum given the uncertainties of the law in this area.

Hershey proceeds on the basis that the law was (and is) clearly established that the sidewalk surrounding the Center was a public forum even though the city-owned arena was managed by a private entity and that private entity oversaw the concert that was ongoing at the time of the incident at issue. There is evidence, from an exhibit to the Amended Complaint, that the outside of the Center as well as the inside can be leased for events. Hershey alleges that the sidewalks just outside the concert were public, but he does not consider what contractual arrangements ASM Global may have had in place with the concert organizers.

Several courts have recognized that public property may change its character for purposes of First Amendment forum analysis based on temporary uses. In considering the public sidewalks used for the Iowa State Fair, the Eighth Circuit concluded that the public property "should be considered a limited public forum, *at least during the 11 days each year when the Iowa State Fair is underway*."[18] The Supreme Court similarly found that the Minnesota State Fair "is a limited public forum in that it exists to provide a means for a great number of exhibitors *temporarily*."[19]

Our court recently addressed a factual situation that is similar to the one presented in this case. In *Siders v. City of Brandon, Mississippi*,[20] a Christian evangelist challenged a city ordinance that restricted protesting and demonstrating on a sidewalk outside a city-owned and operated public

---

[18] *Powell*, 798 F.3d at 700 (emphasis added).

[19] *Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51 (1981) (emphasis added).

[20] 123 F.4th 293 (5th Cir. 2024).

amphitheater during time periods surrounding a live, ticketed concert event.[21]  In that case, we determined the sidewalk outside the amphitheater to be a traditional public forum.[22]  We nevertheless held that the plaintiff was not likely to succeed on the merits of the claim that the ordinance violated First Amendment rights.  As to whether the sidewalks at issue were a traditional public forum, *Siders* is distinguishable from the instant case because here a private entity was involved in managing the Center.  Additionally, given that the Supreme Court has indicated that sidewalks on public property are not automatically public forums[23] and that the district court considered several cases concerning the forum status of spaces surrounding arenas that do not speak in unison,[24] the forum status of the space in question was not clearly established.  Hershey has not overcome the qualified immunity defense.

I also note that in the district court, the Bossier City defendants argued that Hershey had failed to allege facts to support his claim that the officers discriminated against him on the basis of viewpoint.  They pointed out that Hershey failed to allege that the officers looked at the content of his leaflets or otherwise knew about the content.  Nor did he allege the officers heard any

---

[21] *Id.* at 296.

[22] *Id.* at 303.

[23] *See, e.g.*, *Kokinda*, 497 U.S. at 730 (noting it "is not [] settled doctrine" to "designate all sidewalks open to the public as public fora"); *Burson v. Freeman*, 504 U.S. 191, 216 (1992) (Scalia, J., concurring) ("'Streets and sidewalks' are not public forums in all places.") (emphasis omitted).

[24] *See Ball v. City of Lincoln*, 870 F.3d 722, 736 (8th Cir. 2017) (holding a plaza area outside of a city-owned arena to be a nonpublic forum); *Pomicter v. Luzerne Cnty. Convention Ctr. Auth.*, 939 F.3d 534, 537 (3d Cir. 2019) (analyzing concourse outside of a publicly-owned arena as a nonpublic forum). *But see Brister v. Faulkner*, 214 F.3d 675, 683 (5th Cir. 2000) (affirming that public university property between an arena and a city sidewalk is a traditional public forum).

statements Hershey made while passing out leaflets. As to the alleged differing treatment accorded the person who was distributing cards for a radio station, Hershey says he was told he had to leave the premises because he had not obtained authorization ahead of time to distribute leaflets outside of and during a large concert that patrons paid to attend. Hershey inquired about the person distributing cards and was told essentially, "We don't know whether he has permission." Hershey left the premises and does not allege what occurred thereafter.

Hershey does not allege that the officer or security guard who asked him to leave subsequently failed to ascertain whether the other individual had prior authorization. Hershey does not allege that after he left, the other person was permitted to continue to hand out cards for any substantial period of time even though he did not have prior authorization. The Amended Complaint depends on speculation to draw an inference that Hershey was singled out based on the content of his literature. The Amended Complaint does not sufficiently allege content or viewpoint discrimination.

Even assuming Hershey could allege that he was treated differently from the person distributing cards for the radio station, the magistrate judge and district court correctly concluded that the law regarding viewpoint discrimination is not clearly established in circumstances like those in the present case.

"The First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech . . . .' There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment."[25] "It is also true

---

[25] *United States v. Grace*, 461 U.S. 171, 176 (1983) (quoting U.S. Const. amend. I).

that 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"[26]  "In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'"[27]  However, if an area is a limited public forum or a nonpublic forum, "[t]he government can restrict access . . . as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."[28]

It is, of course, "axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."[29]  But that principle is a very general one.  It does not clearly establish what the First Amendment prohibits or requires of law enforcement officers when they are policing an area in circumstances similar to those existing at the Center during the Winter Jam concert.

Our court's decision in *Morgan v. Swanson*[30] is instructive on this point.  In *Morgan*, the plaintiff argued that "his right to distribute religious material is clearly established because 'regardless of forum, viewpoint

---

[26] *Id.* at 177.

[27] *Id.* (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

[28] *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001) (alteration in original) (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998)).

[29] *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

[30] 755 F.3d 757 (5th Cir. 2014).

No. 21-30754

discrimination regarding private speech is unconstitutional.'"[31] Our court acknowledged that while this is "generally true," that proposition was too broad to denote a clearly established right.[32] The *Morgan* decision explained, "such a broad generalization is exactly the kind of proposition that will not suffice for the purposes of qualified immunity analysis, as it simply does not provide the official with any sense of what is permissible under a certain set of facts."[33] Our court concluded, "[f]or example, the nearly universal prohibition against viewpoint discrimination does not inform an official as to what, precisely, constitutes viewpoint discrimination."[34] The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."[35]

Hershey addresses *Morgan* in his briefing. He says: "Morgan . . . involved the governmental actors attempting to balance competing, significant constitutional interests," making the case "inapplicable" to this one. He characterizes *Morgan*'s outcome as the result of the "special First Amendment context" present in public schools.

But our analysis in *Morgan* did not turn on the complexity of the context. Rather than focusing on any "special First Amendment context," *Morgan* hinged on whether the official was on notice that their conduct was unconstitutional.[36] Under Supreme Court precedent, "'[t]he dispositive

---

[31] *Id.* at 761.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

[36] *Morgan*, 755 F.3d at 760.

No. 21-30754

question' . . . is whether the violative nature of [the] *particular* conduct is clearly established."[37]

Hershey relies on the statement in *Chiu v. Plano Independent School District*[38]: "It is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum."[39] Our decision in *Morgan* considered *Chiu* "inapposite" because of factual dissimilarities and concluded: "[W]hile *Chiu* may indeed be relevant in discerning the nature and extent of Morgan's rights in the classroom, the case does not itself establish those rights."[40] Just as *Morgan* eschewed *Chiu* as clearly establishing law that governed in that case, we should do likewise in the present case.

Writing for the Court in *Anderson v. Creighton*,[41] JUSTICE SCALIA cogently explained "that the doctrine of qualified immunity reflects a balance that has been struck 'across the board.'"[42] The Court recounted the underpinnings of the doctrine of qualified immunity.[43] It then said, "[s]omewhat

---

[37] *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Mullenix*, 577 U.S. at 12).

[38] 260 F.3d 330 (5th Cir. 2001) (per curiam).

[39] *Id.* at 350.

[40] *Morgan v. Swanson*, 755 F.3d 757, 761 (2014).

[41] 483 U.S. 635 (1987).

[42] *Id.* at 642 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 821 (1982) (BRENNAN, J., concurring)).

[43] *See id.* at 638:

> ("When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Our cases have accommodated these conflicting concerns by generally providing

No. 21-30754

more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken."[44]  The Court continued, "[t]he operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."[45]  The Court admonished that if the level of generality at which the legal rule is identified is too high, "Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading."[46]

---

government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." (internal citations omitted).

[44] *Id.* at 639 (internal citation omitted).

[45] *Id.*; *see also id.* at 639-40 ("It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (internal citation omitted).

[46] *Id.* at 639; *see also id.* ("Such an approach, in sum, would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'") (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

No. 21-30754

Hershey has not cited decisions that clearly establish that the conduct of Marshal Gilbert and Officer Stoll violated First Amendment rights.

## III

Hershey's second contention on appeal is that Marshal Gilbert and Officer Stoll are not entitled to qualified immunity because the law was clearly established that they had to provide Hershey with ample alternative channels of communication, and they did not.  Hershey asserts in his briefing that if the officers "were attempting to enforce a time, place and manner restriction, they must also 'leave ample alternative channels of communication.'"

Here again, the law as to how the Center should be characterized for First Amendment purposes is far from clear.  More pointedly, Hershey has not cited any authority that would put on notice a law enforcement officer policing an event like the one at the Center on the date in question that the officer, personally, was required to provide an alternate forum for distributing leaflets.

## IV

Hershey's third contention on appeal is that Marshal Gilbert and Officer Stoll are not entitled to qualified immunity because they are either plainly incompetent or knowingly violated the law.  He argues that if they "genuinely believed that Plaintiff did not have any First Amendment rights on the Bossier City Arena property because it was private property, then they are 'plainly incompetent.'"  Here again, Hershey cites no decision that would have clearly put the officers on notice that the Center was not comparable to "private property" for First Amendment purposes during the Winter Jam concert, or that their conduct in asking Hershey to leave the area violated his First Amendment rights.

No. 21-30754

## V

Hershey contends that he has pled a facially plausible *Monell* claim based on his allegations that Bossier City failed to train both its own law enforcement officers and ASM's private security guards "allowed to serve as security personnel" at the Center. The Supreme Court has made clear that municipal liability based on *Monell*[47] requires *deliberate indifference*.[48] With great respect, JUDGE DENNIS's and JUDGE HO's opinions in the present case substantially erode and trivialize that principle.

This is a single-incident case in which Hershey relies on his own confrontation with city officers and private security guards to establish municipal liability. This case does not present the "rare" and "narrow and extreme circumstances" that our court and the Supreme Court has said permit "drawing the inference" of "deliberate indifference."[49]

## A

The Supreme Court established in *Monell*[50] that "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the

---

[47] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[48] *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

[49] *Garza v. Donna*, 922 F.3d 626, 638 (5th Cir. 2019) (quoting *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616 (5th Cir. 2018)).

[50] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

No. 21-30754

policy or custom."[51]  A party must sufficiently allege each element before municipal liability can attach.[52]

The Supreme Court explained in *City of Canton v. Harris*[53] that "[m]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers."[54]  The Supreme Court continued, "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."[55]  While a failure to train can be a "policy,"[56] that determination usually requires a pattern of constitutional violations.[57]  There is nothing in Hershey's Amended Complaint that reflects a deliberate or conscious choice by Bossier City among various alternatives regarding the need for training its law enforcement officers.  There had been no prior incident in which it was even alleged that city officers had violated the First

---

[51] *Winder v. Gallardo*, 118 F.4th 638, 647 (5th Cir. 2024), cert. denied, 145 S. Ct. 2816 (2025) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

[52] *See Brown v. Tarrant County, Tex.*, 985 F.3d 489, 497 (5th Cir. 2021) (concluding that this court need not consider whether the plaintiff sufficiently alleged the policymaker or constitutional violation element when "he did not link his allegedly unconstitutional confinement to any county 'policy or custom'); *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010) (not considering the "moving force factor" because the plaintiff had "not established a 'custom or policy'").

[53] 489 U.S. 378 (1989).

[54] *Id.* at 389 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (opinion of Rehnquist, J.)).

[55] *Id.*

[56] *See Garza*, 922 F.3d at 637.

[57] *Harris*, 489 U.S. at 397 (O'Connor, J., concurring in part and dissenting in part); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

No. 21-30754

Amendment by telling individuals they could not pass out literature without prior approval, much less allegations of viewpoint discrimination.

The Supreme Court explained its rationale more fully in *Board of County Commissioners of Bryan County v. Brown*.[58]  The Court said that in *Canton*, it "spoke . . . of a deficient training 'program,' necessarily intended to apply over time to multiple employees."[59]  The Court reasoned that:

> [i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.  Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.[60]

The Supreme Court again emphasized in *Connick v. Thompson*[61] that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[62]

The Supreme Court has made clear that in *Monell*[63] cases, deliberate indifference may be inferred in failure-to-train-at-all cases "in a narrow range of circumstances" if the violation of federal rights is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools

---

[58] 520 U.S. 397, 409-410 (1997).

[59] *Id.* at 407.

[60] *Id.*

[61] 563 U.S. 51 (2011).

[62] *Id.* at 62.

[63] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

to handle recurring situations."[64]   The Supreme Court emphasized that whether such a consequence is "obvious" depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[65]

There is no allegation that viewpoint discrimination by a Bossier City law enforcement officer against someone engaging in free exercise of religion or free speech has ever previously occurred.[66]   It is not highly predictable that law enforcement officers would have recurring encounters with individuals paid to distribute literature outside a large, pay-to-attend event.   Nor is it highly predictable that, absent specific training about what is "public" versus "private" property and viewpoint discrimination, those officers would discriminate based on the content of the literature being distributed.

JUDGE DENNIS's and JUDGE HO's opinions permit an outsized path to liability because many plaintiffs would be able to granulate allegations so finely that they arrive at a "complete failure to train" as to the relevant conduct.   This ignores the Supreme Court's repeated warning: "[I]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident."[67]

---

[64] *Bd. of Cty. Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397, 409-410 (1997).

[65] *Id.*

[66] *But see Littell v. Houston Indep. Sch. Dist.,* 894 F.3d 616, 624–25 (5th Cir. 2018) ("The municipal entity must have 'fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is *certain* to face.'" (emphasis added) (quoting *Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring)).

[67] *City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (internal quotation marks omitted).

No. 21-30754

"[V]irtually every instance"[68] is just the opposite of the "rare"[69] and "extreme"[70] circumstances in which the single-incident exception should apply.

Hershey says, and JUDGE DENNIS's and HO's opinions agree, that if a city fails to train "at all" regarding the First Amendment, then it is "obvious" that a constitutional violation will occur. This not only permits liability for what may be, at most, mere negligence, it essentially imposes strict liability for a failure to train.[71]

Our court has said that in some circumstances "there is a difference between a *complete failure to train* . . . and a failure to train in one limited area."[72] Hershey alleges the City failed to train its officers on the public

---

[68] *Id.*

[69] *Littell*, 894 F.3d at 627.

[70] *Id.*

[71] *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 61–62, (2011) ("'[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. . . . A less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities . . .'" (quoting *City of Canton v. Harris*, 489 U.S. at 392 (1989))); *see also Loera v. Kingsville Indep. Sch. Dist.*, ___ F.4th___, No. 24-40481, 2025 WL 2425186, at *5 (5th Cir. Aug. 22, 2025) ("Deliberate indifference 'is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' 'A showing of simple or even heightened negligence will not suffice.'" (first quoting *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997), then quoting *Brown*, 520 U.S. at 410)).

[72] *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273 (5th Cir. 2002) (alteration and internal quotation marks omitted) (quoting *McClendon v. City of Columbia*, 258 F.3d 432, 442–43 (5th Cir. 2001), *vacated for reh'g en banc*, 285 F.3d 1078 (5th Cir. 2001), *decision on rehearing en banc*, 305 F.3d 314 (5th Cir. 2002)); *see also Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009) ("[The] 'narrow' single incident exception has applied when the court finds a complete failure to train, not just a failure to train in 'one limited area'"

nature of the arena and surrounding park and the corresponding First Amendment implications.[73]   In other words, Hershey alleges a "failure to train in one limited area" and not "a complete failure to train."[74]  But even if Hershey's Amended Complaint could be characterized as alleging a complete failure to train, to say that the need for training was "obvious" in this case would undermine virtually every precept of our *Monell* jurisprudence.

Our court has refused to allow single-incident failure-to-train cases to diminish the bedrock concepts underpinning *Monell* liability, even when the plaintiff's injury was severe and it might seem "obvious" to a lay person that training likely would have prevented the injury.  Our decision in *Garza*[75] is just one example.  JUDGE DENNIS's and JUDGE HO's opinions both rely on *Garza*, but it completely undermines the positions espoused in those opinions.  In *Garza*, Garza's mother sought help from law enforcement when she feared her son, who was intoxicated, would take his own life or would hurt himself.[76]   Garza was taken into custody at a detention center.[77] Sometime after 8:00 a.m., he obscured the lens of the camera that was trained on him in his cell.[78]  The person tasked with monitoring the camera feed, Minerva Perez, said that after 8:00 a.m., when jailers arrived for their shifts,

---

(quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383, 386 (5th Cir. 2005)).

[73] *See Ante* at 25.

[74] *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018).

[75] *Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019).

[76] *Id.* at 630-31.

[77] *Id.*

[78] *Id.* at 631.

No. 21-30754

it was their responsibility to monitor the jail inmates.[79]  When the jailers were on duty, they became occupied putting up a sarcastic "welcome" sign for inmates and the logo of a comic-book character, and they "missed that Garza had hanged himself."[80]  ICE agents arrived at 8:40 a.m. and found Garza dead at 8:49 a.m.[81]  In the ensuing litigation, Garza's survivors claimed that "Perez displayed 'utter confusion' about her responsibility to monitor the jail's camera feeds, invoking the failure-to-train principles articulated by *City of Canton v. Harris*."[82]  Our court held that this claim failed because "[a]s we have emphasized, deliberate indifference may be inferred this way 'only in narrow and extreme circumstances,' and decisions by our court drawing the inference are rare."[83]  We further explained that "the record has no evidence about the population that passes through the City's jail or about the jail's operations from which the possibility of recurring situations threatening to constitutional rights might be assessed.  It is apparent that this record is inadequate to support a failure-to-train theory as to Perez."[84]

So too, in this case.  There is no allegation as to how many individuals frequent areas outside the Center during events in order to distribute literature.  There is no allegation from which the risk of recurring situations like the one at issue in this case can be assessed.  Again, the Supreme Court has emphasized that whether a consequence is "obvious" depends on "[t]he

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.* at 637.

[83] *Id.* at 638.

[84] *Id.*

likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[85]

Saying that the need for training was "obvious" in this case would call into question the core tenets of our *Monell* jurisprudence, for the reasons discussed above. Even if Hershey's constitutional rights were violated, this is a case in which only a few individuals violated those rights on one occasion. This a not a case for application of the "obvious" exception. We have reserved that exception for cases of a far different ilk than this one.

JUDGE DENNIS's opinion asserts that Hershey alleged Bossier City "did not have *any* policy . . . regulating speech activities protected by the First Amendment."[86] This implies, if not states, that if Bossier City had provided at least some training on any aspect of the First Amendment, there could be no "complete failure to train" claim, and we would be in ordinary "failure-to-train" territory. The logic here escapes me. If Bossier City had trained its law enforcement officers about how to address an entirely *different* First Amendment issue—for instance, permissible means of policing protestors who shut down a highway with their presence—how would that have affected Hershey's claim? Such training would not bear on preventing viewpoint discrimination against someone handing out leaflets. Yet, it would be "some" First Amendment training, so the "no training at all" theory would be inapplicable. This elusive and slippery nature of a failure-to-train-at-all claim in the context of this case is apparent from the very next sentence in Judge Dennis's opinion, which says, "Hershey alleged the City failed to train its police officers and private security personnel of citizens' First Amendment rights on public property, including the area surrounding the

---

[85] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

[86] *Ante* at 15.

Center."[87]  That is a much more specific claim, and if Bossier City had notice that it needed to train for that specific potentiality, Hershey likely would have stated a claim.  So, to be clear, the failure-to-train-at-all theory in a case like the present one is nothing more than a "gotcha."  Providing some First Amendment training, even though it had no bearing at all on the alleged First Amendment violation, would foreclose reliance on the theory.  But failure to train "at all" results in strict liability when there was no notice "at all" of the need to train for the specific First Amendment violation alleged.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," and "'[d]eliberate indifference' is a stringent standard of fault."[88]  The requisite standard of fault is not met here and Hershey has therefore failed to sufficiently plead allegations of liability under *Monell*.[89]

## B

Hershey's Amended Complaint seeks money damages from Bossier City for its failure to train not only its own law enforcement officers but the *private security guards who were hired by ASM Global* for a concert on a particular day.  Hershey's brief cites no decision whatsoever that holds a municipality liable for failure to train a private party's employees.

Nevertheless, Judge Dennis's and Ho's opinions permit Hershey to proceed with his claim that Bossier City is liable for failing to train security guards ASM hired.  I disagree and would affirm the district court's judgment in this regard.

---

[87][ *Id.*]

[88] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[89] *Supra* note 50 and accompanying text.

No. 21-30754

## VI

In a fifth issue raised in Hershey's appeal, he asserts that ASM Global's private security guards worked together with the Bossier City defendants to eject him from the Center and that he has stated a cause of action under the "nexus/joint action tests." "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by *a person acting under color of state law*."[90]

## A

The nexus test asks "whether the State has inserted 'itself into a position of interdependence with the [private actor, such] that it was a joint participant in the enterprise.'"[91] In other words, the question is whether there is a "'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"[92]

Hershey's complaint alleges virtually no facts regarding "interdependence" between Bossier City and ASM Global's private security guards. The Amended Complaint alleges that the City "owns and operates a public facility known as the Bossier City Arena, which at all times relevant herein was known as the CenturyLink Center." It alleges that defendant security guards were security guards at the CenturyLink Center. It then alleges: "Defendant the City has a long-standing custom of allowing police officers, employees and/or officials of CenturyLink Center to use their unfettered

---

[90] *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added).

[91] *Cornish v. Corr. Srvs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005) (alteration in original) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357-58 (1974)).

[92] *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson*, 419 U.S. at 351).

discretion to arbitrarily and capriciously remove individuals who are peacefully exercising their First Amendment rights from the CenturyLink property." This latter allegation is entirely conclusory. It provides no factual support whatsoever for this assertion.

These allegations are insufficient to permit a factfinder to infer that there is such a close nexus between Bossier City and ASM Global security guards that the actions of the latter "may be fairly treated as that of the State itself."[93] There are no allegations about the nature of the contractual relationship between Bossier City and ASM Global, or between ASM Global and its security guards. Nor are there factual allegations about whether the City routinely relies on private security guards to police the areas abutting or surrounding the Center.

## B

Under the joint action test, "private actors will be considered state actors where they are 'willful participant[s] in joint action with the State or its agents.'"[94] "[T]he plaintiff must allege and prove that the citizen conspired with or acted in concert with state actors."[95]

Hershey's Amended Complaint alleges that Bossier City Marshal Gilbert approached Hershey with security guard Harvey and police officer Stoll. Marshal Gilbert waived a pair of handcuffs at Hershey, and Officer Stoll told Hershey that he had been told to leave the park. Marshal Gilbert then told Hershey that he had bracelets for Hershey and would put them on him and take him to jail. Marshal Gilbert said that "people were there to have a good

---

[93] *See Brentwood Acad.*, 531 U.S. at 295 (quoting *Jackson*, 419 U.S. at 351).

[94] *Cornish v. Corr. Srvs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

[95] *Mylett v. Jeane*, 879 F.2d 1272, 1275 (5th Cir. 1989).

time." Security guards Smith and Tucker arrived shortly thereafter. Hershey asked about the commercial leafleteer distributing literature nearby, and security guard Harvey replied that Hershey's literature was unauthorized—but that Harvey did not know whether the commercial leafleteer was authorized.

The facts alleged regarding security guards Smith and Tucker are not sufficient to meet the joint action test. The complaint alleges only that "Smith and Tucker were present during Hershey's ejectment from the park . . . and, acting jointly with the other Defendants, used their command presence to assist in the removal of Hershey from the park by Defendant Deputy Marshal Gilbert, Officer Stoll, and Harvey." Smith and Tucker allegedly "arrived shortly" after Marshal Gilbert had told Hershey to leave and had waived handcuffs at him. A reasonable factfinder could not infer from Smith and Tucker's presence that they willfully participated in Hershey's removal. Nor does the complaint allege that the "use[]" of their "command presence" meant more than that Smith and Tucker were present during the incident.

Security guard Harvey spoke to Hershey in the presence of the two Bossier City law enforcement officers. But security guard Harvey's statements do not indicate he understood or believed that Bossier City, as opposed to ASM Global, required prior approval before literature could be distributed. Hershey alleged quite specifically that security guard Harvey said that Hershey's "literature had not been approved by CenturyLink Center, and that Hershey had to submit his literature in advance for approval." That is a requirement of a private, not a state, actor. Neither of the city law enforcement officers indicated that they thought there was a prior-approval requirement by either Bossier City or ASM Global. Hershey's allegations do not sufficiently allege joint action.

No. 21-30754

## VII

Hershey contends in his sixth and final issue on appeal that he stated a claim against the private security guards under the public function test. Under that test, "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.'"[96] But, "to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally and exclusively performed the function" and "[t]he [Supreme] Court has stressed that 'very few' functions fall into that category."[97] One of those narrow categories is "operating a company town."[98]

Hershey argues that the defendants "engaged in the regulation of speech on the public sidewalk" and that "[t]he regulation of speech in a public forum has been traditionally and exclusively a function of the state." However, the only authority he cites for this proposition is *Marsh v. Alabama*,[99] a case involving the regulation of speech in a company town.[100] That case does not carry the day based on the facts Hershey has alleged.

The Center was being used to host a concert at the time Hershey was asked to leave. Hershey has cited no authority that policing the sidewalks

---

[96] *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (quoting *Jackson*, 419 U.S. at 352).

[97] *Id.* (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978)).

[98] *Id.*

[99] 326 U.S. 501, 505–06 (1946).

[100] *See id.* ("Our question then narrows down to this: Can those people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town?").

No. 21-30754

abutting an arena like the Center during such an event is a power exercised exclusively by state actors.

Hershey's complaint does not allege that the defendant security guards were licensed by Bossier City or "endowed by law with plenary police powers such that they are *de facto* police officers."[101]  Nor does he allege that the private security guards were licensed by the city and empowered by an ordinance to exercise "all of the powers of the regular police patrol."[102]

*      *      *

I would AFFIRM the judgment of the district court.

---

[101] *See Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005).

[102] *See Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 630 (7th Cir. 1999). (quoting CHI., ILL., MUN. CODE § 4-340-100 (1992)).